ELISA DÍAZ GONZÁLEZ, ETC., peticionaria, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. HÉCTOR A. COLÓN CRUZ, JUEZ, demandado; CARMEN DE LOURDES BORGES, interventora.

*Número:* O-73-206        *Resuelto:* 22 de abril de 1974

196

*Francisco De Jesús Schuck, Secretario de Justicia, Myriam Naveira de Rodón, Procuradora General, Peter Ortiz, Sub-procurador General, y Roberto Armstrong, Jr.,* abogados de la peticionaria; *José Ramón Pérez Hernández,* abogado de la interventora.

El Juez Asociado Señor Rigau emitió la opinión del Tribunal.

Esta opinión y la emitida en *Pastor Lozada* v. *Director Ejecutivo,* 101 D.P.R. 923 (1974), en cierto sentido se complementan. En aquélla explicamos cómo operan las disposiciones de la Ley de Personal que dividen los cargos o empleos del servicio público de Puerto Rico en tres grandes grupos, a saber, el Servicio Exento, el Servicio Sin Oposición y el Servicio por Oposición.(1) En *Pastor Lozada,* supra, describimos la libertad que tiene la autoridad nominadora para nombrar y despedir empleados en los Servicios Exento y Sin Oposición y los requisitos de ley que hay que observar tanto para nombrar como para despedir personal en el Servicio Por Oposición. En el caso de autos se trata de violaciones a la Ley de Personal cometidas por la autoridad nominadora al nombrar o incluir a determinado personal en el Servicio Por Oposición.

█ La interventora es una empleada del Departamento de Servicios Sociales de Puerto Rico. Para el año 1972 ocupaba el cargo de *Director Regional* de dicho departamento.

---

(1) Ley de Personal, Ley Núm. 345 de 12 mayo 1947, según enmendada, 3 L.P.R.A. secs. 641 y ss.

Ese cargo, por su naturaleza normativa y de confianza, estaba comprendido en el Servicio *Sin Oposición* de la Ley de Personal del Gobierno de Puerto Rico. Dicha clasificación del cargo implica que el incumbente ocupaba el cargo a voluntad de la autoridad nominadora. Esto es así como cuestión de una sana, correcta y bien establecida norma en todos los sistemas científicos de administración de personal en cuanto a los cargos de confianza se refiere. [2]

En 2 de octubre de 1972, un mes antes de las elecciones generales celebradas en Puerto Rico en 7 de noviembre de 1972, el jefe del Departamento de Servicios Sociales cambió todos los puestos de *Directores Regionales* de dicho Departamento, del Servicio *Sin Oposición* al Servicio *Por Oposición* y le dio a la interventora status de empleada en dicho Servicio por Oposición, sin que ésta hubiese aprobado oposición alguna para dicho cargo. Esto es, sin que la interventora hubiese concurrido a exámenes o hubiese competido con otros posibles candidatos o solicitantes para el cargo. [3] Eso se hizo en violación de la Ley de Personal y del espíritu y de la filosofía que informan el sistema de mérito.

En otras palabras, a una empleada que desempeñaba una posición clave, normativa y de confianza y que correctamente estaba incluida en el Servicio *Sin Oposición* se le dio, sin observar la ley, status de empleada *Por Oposición*, con derecho a ser removida solamente mediante formulación de cargos y por justa causa, como si se tratase de una empleada y de un cargo meramente oficinesco, sin facultades directivas, normativas y de confianza.

---

[2] Véase Sec. 8 de la Ley de Personal, 3 L.P.R.A. sec. 648 (b) (2).

[3] El término "oposición," en el contexto en que lo usa la Ley de Personal y en el que se usa en esta opinión significa concurso o competencia de los pretendientes a un cargo o empleo, realizado por medio de exámenes o ejercicios que demuestran su suficiencia o capacidad para ocupar el cargo al que aspiran.

El resultado obvio de la operación antes descrita sería el que un nuevo jefe del Departamento de Servicios Sociales se vería obligado a dirigir y hacer funcionar todo un Departamento de Gobierno rodeado de subjefes—los Directores Regionales—que no eran de su confianza. No es necesario ser perito en Ciencia Política, ni en Administración Pública para entender lo anómalo de la situación que se pretendía crear.

Ocurrió lo que era de esperarse. Llegó un nuevo jefe de Departamento y necesitando reclutar personal de su confianza para los cargos de confianza, específicamente para los cargos de Directores Regionales, los cuales son su *alter ego* en cada región del país, no ya despidió sino que solamente cambió de trabajo a la interventora asignándole otro cargo en el Departamento de acuerdo a su experiencia y habilidad.

No conforme con lo expuesto en el párrafo precedente, la interventora presentó demanda de *mandamus* en el Tribunal Superior, Sala de San Juan, solicitando que el tribunal ordenase que la allí demandante fuese repuesta en el cargo de Directora Regional del Departamento de Servicios Sociales. En su demanda la interventora aunque alegó que no tenía otro remedio en ley, sin embargo, presentó en el mismo mes y año una querella en la Junta de Personal al amparo de la Ley de Personal. No favorecemos esas alegaciones que no corresponden a la realidad.

En la misma fecha de la presentación de la demanda de *mandamus*, el tribunal, sin citar ni oír a la demandada, la Secretaria de Servicios Sociales, expidió una Orden ordenando a la demandada a reponer a la allí demandante en el cargo de Directora Regional antes mencionado. También ordenó el tribunal a la demandada a comparecer el 18 de julio de 1973 para la celebración de una vista. Como la orden perentoria tiene fecha de 31 de mayo de 1973, la misma obligaba a la Secretaria de Servicios Sociales a mantener por espacio de mes y medio en la posición de Directora Regional,

una posición normativa y de confianza, a una persona que no era de su confianza.

Esa intromisión en las funciones de la Rama Ejecutiva fue a todas luces injustificada pues no concurría en el caso ninguna circunstancia de emergencia que la justificase y debió prevalecer la ponderación, consideración y cortesía (*comity*) que se deben las tres ramas del Gobierno una a la otra.

■ Además, la ley dispone que para expedirse el auto perentorio, como se hizo en este caso, es necesario que concurran dos circunstancias: (a) que el derecho a exigir la inmediata ejecución del acto *sea evidente* y (b) aparezca *que no se podrá dar ninguna excusa* para no ejecutarlo. Una adjudicación serena en este caso hubiese reconocido que aunque era posible que la allí demandante tuviese derecho a lo solicitado, su derecho no era evidente, sino que era controvertible y también hubiera reconocido que era posible que la demandada, una Secretaria de Gobierno, tuviese excusa o razones válidas para no ejecutar el acto solicitado. Regla 55 de Procedimiento Civil.

Como dijimos en *Dávila* v. *Superintendente de Elecciones*, 82 D.P.R. 264 (1960), a la pág. 283:

"Para que deba expedirse un auto de mandamus, sin embargo, no es suficiente que el peticionario tenga un derecho claro a lo que solicita y que el demandado tenga la obligación correspondiente de permitir el ejercicio de ese derecho. Se trata de un auto 'altamente privilegiado,' según expresa la ley de su creación, 32 L.P.R.A. sec. 3421, y los tribunales tienen necesariamente que medir todas las circunstancias concurrentes, tanto al determinar si debe o no expedirse el auto como al fijar el contenido de la orden, una vez resuelta en la afirmativa la cuestión inicial. En otras palabras, el remedio no se concede *ex debito justitiae* y tan pronto se reconoce el derecho del peticionario, sino únicamente cuando el tribunal esté convencido de que se cumplirán propósitos de utilidad social e individual. Para esos fines, es indispensable estimar qué efectos tendrá la orden en el

adecuado cumplimiento de las responsabilidades del funcionario afectado por ella y hasta qué punto habrá de beneficiar al solicitante. Procede, en síntesis, establecer el más fino equilibrio posible entre los diversos intereses en conflicto."

En 15 de junio de 1973 declaramos sin lugar la presente solicitud de *certiorari* instada por el Procurador General pero examinada su bien razonada moción de reconsideración decidimos que en justicia debíamos reconsiderar y expedimos una Orden Para Mostrar Causa consolidando este caso con dos más y le dimos al demandado y a los interventores un plazo para mostrar causas por las cuales no debían dejarse sin efecto nuestras resoluciones de 15 de junio de 1973 en esos tres casos, expedirse el auto de *certiorari* solicitado por el Procurador General y revocar la orden de *mandamus* dictada por el Tribunal Superior en 25 de mayo de 1973 en dichos casos y la orden enmendada de *mandamus* dictada por dicho tribunal en 31 de mayo de 1973 en el caso de autos.

Luego de una prórroga concedida, la interventora presentó un escrito como mostración de causas, el cual no nos ha persuadido.

La Ley de Personal del Gobierno de Puerto Rico—cita precisa en el escolio 1 de esta opinión—es una pieza de legislación que hace honor a la Asamblea Legislativa de Puerto Rico y que debe observarse, interpretarse y aplicarse con la ponderación, cuidado y respeto que las cosas bien hechas merecen. Dicha ley tiene bien conocidos antecedentes en la administración pública o gubernamental de otros países.

No es éste el lugar para hacer un reseña detallada del desarrollo del sistema de mérito en el mundo, pero no hace daño que cuando el abogado o el juez interpretan o aplican una institución importante del derecho estén conscientes de sus raíces y de su desenvolvimiento a través del tiempo. Si eso es mucho pedir, por lo menos deben estar conscientes de

que hay tales raíces y tal desarrollo; que no se trata de meras improvisaciones de ayer que existen por capricho. (⁴)

Merece recordarse que—por lo menos en el mundo moderno—fue Prusia la nación pionera en esta materia. Se estableció en aquel país en el siglo 17 el comienzo de un sistema de servicio civil basado en el mérito, el cual, sujeto a las modificaciones subsiguientes necesarias, por más de siglo y medio no tuvo igual en el mundo. Se probaba, en aquel sistema, la capacidad de los aspirantes a cargos y empleos públicos por medio de exámenes escritos y orales. (⁵)

En Francia, el incipiente sistema de servicio civil establecido por la monarquía fue barrido por la revolución pero el genio de Napoleón hizo que se estableciese un sistema sobre bases más sólidas y el cual conjuntamente con el de Prusia ejerció considerable influjo en muchos otros países.

En Inglaterra la administración pública en escala nacional tuvo sus comienzos luego de la invasión de Guillermo El Conquistador. Parte de esa administración fue la administración de la justicia. Como se sabe, como consecuencia de las reformas administrativas de los reyes normandos y de los que les siguieron dejó de aplicarse el derecho impuesto por las cortes locales de los señores feudales y en su lugar comenzó a aplicarse el derecho impuesto por los jueces nombrados por el rey, de suerte que se aplicaba un solo derecho a

(⁴) Véase, por ejemplo, Castán, *Teoría de la Aplicación e Investigación del Derecho* (1947), pág. 105 *ab initio*; C. K. Allen, *Law in the Making*, 7ma. ed., Oxford P.B. (1966), pág. 3; Holmes en su Introducción (1911) al tomo 1 del *General Survey of Continental Legal History* del Continental Legal History Series, ed. Rothman-Kelley (1968), pág. xlv; W. Friedmann, *Legal Theory*, 5ta. ed. (1967), Cap. 5.

(⁵) Desde el 1640 y por más de un siglo Prusia fue gobernada por cuatro reyes de los cuales tres tuvieron un talento administrativo extraordinario: Federico Guillermo de Brandenburgo (1640–88), Federico Guillermo I (1713–40), y Federico El Grande (1740–86). Finer, *The Theory and Practice of Modern Government*, ed. rev. (1960), pág. 727.

todo el reino, esto es, un "derecho común" a todos. Así surge el *common law* anglosajón.([6])

Dicha administración pública nacional en Inglaterra cobró un desarrollo notable bajo Enrique II (siglo 12) y continuó su desarrollo paulatino según las funciones administrativas, legislativas y judiciales se fueron diferenciando una de otras. Ese lento desarrollo histórico sufrió una pausa con motivo de las luchas políticas inglesas del siglo 17, como consecuencia de las cuales quedó establecida en Inglaterra la hegemonía del Parlamento. No es esto de lamentarse, sin embargo, porque el desarrollo del constitucionalismo, esto es, del gobierno con poderes limitados, y de las libertades individuales, producto de aquellas convulsiones, han beneficiado a prácticamente el mundo entero.

A pesar de la interrupción antes mencionada, o tal vez debido a ella, desde la segunda mitad del siglo 19 en adelante Inglaterra produjo el servicio civil por excelencia. Su competencia, probidad y patriotismo no han sido superados por ningún otro sistema de mérito. Es de recordarse la famosa *Order-in-Council* de 1855 que estableció la Comisión de Servicio Civil inglesa y que echó las bases para la reforma del servicio civil en aquel país.

En los Estados Unidos, luego de la desgraciada experiencia del llamado principio del botín (*the spoils system*), cobró fuerza después de la guerra entre los estados el movimiento de reforma del servicio civil. Naturalmente, desde mucho antes ya mentes preclaras habían abogado por el establecimiento del sistema de mérito en el gobierno federal y en los estados. El movimiento de reforma antes mencionado culminó con la Ley Pendelton de 1883, la ley básica del servicio civil del gobierno federal. Para un recuento bastante detallado del desarrollo del sistema de mérito en el gobierno de

---

([6]) El cual no debe confundirse con el derecho (civil) común a toda España, a diferencia del foral. V. Castán, *Derecho Civil Español, Común y Foral*, Tomo 1, Vol. 1, 10ma. ed. (1962), pág. 128–129 y 195.

los Estados Unidos, puede verse el capítulo I del libro de Kaplan, *The Law of Civil Service* (1958).

■ La primera ley de servicio civil de Puerto Rico fue la Ley aprobada el 14 de marzo de 1907. Creó una Junta de Servicio Civil, luego llamada Comisión de Servicio Civil, compuesta por tres miembros nombrados por el Gobernador con la aprobación del Consejo Ejecutivo. Se explica la referencia al Consejo Ejecutivo porque dicha ley se aprobó bajo el régimen de la Ley Foraker.

La referida Ley de 1907 dividió el servicio civil entre el servicio civil clasificado y el no clasificado. El no clasificado correspondía, en términos generales, a los funcionarios de alto rango y a los empleados de confianza que hoy están en el Servicio Exento. Los demás puestos del gobierno se incluyeron en el servicio clasificado, con excepción de los maestros, los policías y los registradores de la propiedad. La ley estableció que los nombramientos se harían de acuerdo con los méritos del aspirante y previo examen. La Comisión de Servicio Civil, como es usual en estos organismos administrativos, tenía funciones judiciales, legislativas y también ejecutivas o administrativas.

Todo parece indicar que todavía el clima político no estaba preparado para la autodisciplina que implica un sistema de mérito en el servicio público. No se le asignaron fondos suficientes a la Comisión (de 1907 a 1924 su personal constaba solamente de los oficinistas), se evadía la ley haciendo nombramientos "temporeros," no clasificados, que duraban por años y en general no se realizó el propósito de la ley.

En 1931, un gobernador reformista, Teodoro Roosevelt, decidió revivir la idea del sistema de mérito y en su mensaje a la Legislatura, se expresó como sigue:

"La base sobre la cual descansa una administración competente es una Ley sobre el Servicio Civil, destinada a satisfacer el principio del mérito. En la actualidad nuestra ley no realiza

estos propósitos y tiene que ser enmendada o reemplazada de manera que se vigorice y se proteja el principio del mérito." (7)

Como resultado de los esfuerzos del Gobernador Roosevelt se aprobó nuestra segunda ley de servicio civil, la Ley Núm. 88 de 11 de mayo de 1931. Igual que la ley anterior dividía al servicio civil en servicio clasificado y servicio no clasificado. Creó una Comisión de Servicio Civil compuesta por tres personas nombradas por el Gobernador con el concurso y consentimiento del Senado. No más de dos podían pertenecer al mismo partido político y desempeñarían sus cargos por el término de cuatro años.

Al comienzo de las labores de la nueva Comisión se generó considerable entusiasmo. Se promulgaron las reglas pertinentes y los empleados con nombramientos temporeros fueron clasificados e incluidos en el servicio civil clasificado. A pesar del entusiasmo inicial la historia demostró que aquella década crítica del 1930 al 1940 tampoco fue propicia al desarrollo del sistema de mérito. Ya para fines de esa década otra vez casi la totalidad de los empleados eran empleados "temporeros," los cuales no habían sufrido ningún examen según requerido por las reglas.

Son los años difíciles y duros los que producen en las sociedades las ansias de reforma y los que templan las almas que son capaces de llevarlas a cabo. Así, en el año 1940 y en años subsiguientes entran en la escena política y administrativa del país hombres que encarnaban las ansias de reformas políticas y económicas que las vicisitudes de los veinte años anteriores habían generado. (8)

Para llevar a cabo las amplias reformas que los hombres del nuevo gobierno se proponían realizar hacía falta personal

---

(7) *Actas de la Cámara de Representantes de Puerto Rico* (1931), págs. 16–17.

(8) Véanse Goodsell, *Administration of a Revolution*, Harvard U. Press (1965) y Wells, *La Modernización de Puerto Rico*, editorial U.P.R. (1972). Es traducción española del libro *The Modernization of Puerto Rico* de dicho autor, Harvard U. Press (1969).

preparado y competente. Al principio fue necesario reclutar personal técnico de fuera de Puerto Rico pero era claro que para que las reformas no fueran efímeras, sino que perdurasen era necesario entrenar personal nativo y poner en sus manos la dirección y ejecución de los programas del Gobierno. En el decimoquinto mensaje a la Asamblea Legislativa, de 9 de febrero de 1943, el Gobernador Rexford Tugwell, discutiendo la necesidad de una reforma en el servicio civil expresó:

". . . discutiré las medidas de mejoramiento. Una de ellas—la más importante—reorganizaría la Comisión de Servicio Civil haciendo de ésta una junta de apelaciones pero encomendando la administración de personal a un administrador no político."(9)

El gobierno contrató el Servicio de Administración Pública de Chicago (*Public Administration Service of Chicago*), una prestigiosa firma asesora, para coadyuvar en esta materia. En solidaridad con aquel movimiento de reforma administrativa, la Universidad de Puerto Rico celebró a fines de 1945 una Conferencia sobre Administración Pública en la cual tomaron parte distinguidas personalidades del país y de los Estados Unidos.

Respaldando con su autoridad oficial y con su gran prestigio e indubitable desinterés personal el sistema de mérito en el servicio público, el entonces Presidente del Senado de Puerto Rico, Luis Muñoz Marín, se expresó en dicha Conferencia como sigue:

"No podemos privar a nuestro pueblo de los servicios de los mejores servidores. . . . Nosotros, los que estamos en la vida política desinteresadamente, tenemos un pueblo al que servir y se nos presentan amigos a los que complacer. En todos los casos en que entren en pugna uno y otro reclamo, no debe caberle duda a ningún ciudadano responsable de cuál debe ser su decisión: debe ser, desde luego, recordar que hay un pueblo al que

---

(9) Tugwell, *Puerto Rican Public Papers* (1945), pág. 144.

servir—un pueblo grandemente agobiado al que hay que servirle grandemente."

Más adelante dijo:

"Como Presidente de un partido político, y de un partido político de mayoría, que está desarrollando . . . un vasto programa . . . debo decirles a todos los puertorriqueños con entera franqueza . . . que todas las buenas leyes que se han hecho y que se hagan caerán en la nulidad si no se mantiene un mejoramiento constante en adiestramiento técnico y en comprensión general, en el gran cuerpo de nuestros servidores públicos. A este fin—en el que también va envuelta la seguridad de los servidores públicos—debe contribuir en manera importante, con la buena voluntad de todos, esta Escuela de Administración Pública.

.      .      .      .      .      .      .      .      .

El partido político . . . por su mayoría legislativa y por su posición determinante en cuanto a los puestos ejecutivos llaves del gobierno, traduce ese mandato en leyes y tiene voto determinante en cuanto a la actitud de los hombres que han de tener los puestos ejecutivos llaves en la tramitación práctica de ese mandato. Más allá de eso, el partido político no puede intervenir determinativamente salvo con riesgo, a la corta o a la larga, de la buena administración pública." [10]

Con el asesoramiento del mencionado Servicio de Administración Pública de Chicago se redactó un proyecto de ley, el cual fue sometido a la Asamblea Legislativa y el cual se convirtió en nuestra vigente Ley de Personal, Ley Núm. 345 de 12 de mayo de 1947; 3 L.P.R.A. secs. 641 y ss. Esta ley estableció el sistema de mérito y dividió el servicio civil en tres grupos denominados (a) Servicio Exento, (b) Servicio Sin Oposición y (c) Servicio Por Oposición.

Desde luego, el mejor texto para uno enterarse del sistema así establecido es la Ley de Personal propia, pero puede

---

[10] U.P.R. y Comisión de Servicio Civil, *Puerto Rico y su Programa de Administración Pública*, Actas de la Conferencia Sobre Administración Pública (1945), págs. 19-28.

verse *Pastor Lozada* v. *Director Ejecutivo*, citado al comienzo de esta opinión, en donde describimos brevemente cómo operan esas disposiciones de la ley. También véase García de Serrano, *La Selección de Personal en el Servicio Público de Puerto Rico*, ed. U.P.R. (1969), págs. 13–23.

Dicha Ley Núm. 345 creó una Junta de Personal compuesta de tres miembros nombrados por el Gobernador, con el consejo y consentimiento del Senado, por un término de cuatro años. No más de dos podrán pertenecer al mismo partido político. Entre otros, la Junta tiene deberes de asesoramiento y deberes cuasi judiciales. La ley también crea el cargo de Director de Personal, quien es el ejecutivo del sistema de personal del Gobierno de Puerto Rico y quien es nombrado por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado, por un término de seis años.

A tenor con la ley, el Gobernador no puede nombrar caprichosamente al Director de Personal, pues la propia ley expresamente ordena que el Director "deberá ser una persona con experiencia en administración de personal, familiarizada con sus principios y métodos y partidaria de la selección del personal público a base de méritos y de métodos científicos."—Sección 3 de la Ley de Personal; 3 L.P.R.A. sec. 643.

Así, a través de largas décadas de esfuerzo, de éxitos unas veces y de frustraciones otras, el sistema de mérito se hizo una realidad en la administración del personal del Gobierno de Puerto Rico. La Oficina de Personal tiene a cargo el reclutamiento, la clasificación, la retribución y el adiestramiento de los empleados públicos que bajo su autoridad sirven al país. Concede becas para estudios, realiza estudios para mantener al día el plan de clasificación de puestos y el plan de retribución, lleva a cabo un programa de viajes culturales, en fin, tiene a su cargo el funcionamiento y el mejoramiento del sistema de personal del Gobierno de Puerto Rico.

La citada autora García de Serrano en su antes mencionada obra, concluye el segundo capítulo de su libro con estas palabras:

"Todas estas actividades se llevan a cabo por la Oficina de Personal libre de prejuicios y de favoritismo político. Impresiona el número creciente de selecciones hechas a base de mérito por el sistema de certificación y la disminución de los nombramientos temporeros y provisionales. Hoy día, el sistema de personal del gobierno de Puerto Rico puede decirse que es un servicio eficiente y honrado, libre de prejuicios políticos, religiosos y raciales e inspirado por un intenso deseo de servicio público y un afán de superación."

Tan admirable situación sufrió inusitados descalabros hace dos o tres o cuatro años, algunos de los cuales están surgiendo ahora a la superficie en forma de litigios en los tribunales, tales como el caso de autos, los otros dos que se consolidaron con éste y otros que están en trámite. Sin embargo, esa situación de crisis en la administración del servicio civil del país parece haber sido breve y temporera.

El problema es básicamente uno de educación. De educación general del país y de sus dirigentes políticos y administrativos. En los Estados Unidos, en donde, como se ha visto, el desarrollo del sistema de mérito también fue relativamente reciente, el profesor Woodrow Wilson, más tarde Presidente de aquel país, llamó la atención en su ya clásico artículo *The Study of Public Administration* (1887) a la necesidad de fomentar el estudio de estas materias.[11]

Tan importante es el conocimiento de estas materias por los dirigentes políticos y administrativos del país como su divulgación entre jueces, abogados y el público en general. Esto es así porque los jefes políticos y los ejecutivos del Gobierno toman las decisiones determinantes de cómo ha

---

[11] El citado artículo de Wilson aparece publicado en varias antologías. Una de éstas es *Public Administration and Policy*, ed. por P. Wall (1966).

de ser su gobierno; los jueces y abogados interpretan y juzgan aquellas que suscitan litigios y al público en general corresponde respaldar la buena administración y rechazar la mala. Como acertadamente ha escrito el Profesor Muñoz Amato:

"La verdad es que no pueden implantarse los principios de mérito para el servicio público, ni ninguno de sus requisitos instrumentales, si no existe un consenso favorable en los sectores donde se hacen las decisiones fundamentales sobre la orientación del gobierno. Todavía más, la eficacia de cualquier sistema de administración de personal dependerá continuamente del grado de conciencia y sinceridad del respaldo político en que esté cimentada." (12)

Un distinguido gobernante y político de la América Hispana, en un libro dirigido a sus compatriotas, pero cuya lectura aprovecharía a todos, titulado *Cartas a un Ciudadano* ha expresado con ejemplar sencillez, acierto y candor lo siguiente:

"Una de las cosas interesantes que voy aprendiendo en esta posición presidencial en que usted me ha colocado, es que el Gobierno cumple dos funciones distintas, que solemos confundir generalmente, cual si fueran una sola.

Esas dos funciones pueden llamarse, para distinguirlas con nombres diferentes, 'administrar' y 'gobernar.'

*Administrar* es dirigir el funcionamiento diario de los organismos públicos, tal cual se maneja una empresa particular o un negocio de tamaño grande. Repartir el trabajo organizadamente, ver que cada funcionario cumpla con su deber, percibir las entradas de dinero y hacer los gastos llevando buenas cuentas.

*Gobernar* es en esta distinción que estoy haciendo, encauzar el esfuerzo nacional hacia la formación de una patria mejor, constituida por ciudadanos mejores, y que proporcione a sus hijos un ámbito de vida mejor. . . .

Poner orden y exigir eficiencia en las oficinas públicas, es administrar bien. Estudiar las causas de los males nacionales,

---

(12) Muñoz Amato, *Introducción a la Administración Pública*, Tomo II (1957), pág. 91.

concebir planes para remediarlos, crear las instituciones necesarias, y fomentar las costumbres más deseables, es gobernar bien." ([12-A])

Debe ser claro que los funcionarios normativos (*policy making*) del ejecutivo y de la mayoría legislativa deben tener una filosofía de gobierno y unas actitudes frente a los problemas del país que sean compatibles—y no contrarias—a la del gobierno electo por el pueblo y bajo el cual sirven. Eso da vigencia al mandato popular, pues hace posible realizar el programa de gobierno que el electorado favoreció en las urnas. Lo contrario sería frustrar dicho mandato popular. La Ley de Personal, reconociendo esa realidad, sabiamente coloca a esas posiciones en los servicios Exento y Sin Oposición. También coloca en esos servicios mencionados a los cargos o empleos de confianza, como lo son usualmente el del ayudante de un ejecutivo exento o el de su secretaria personal. Esos funcionarios normativos y esos empleos o cargos de confianza constituyen un reducido por ciento de todo el personal del gobierno.

Desde luego, lo dicho en el párrafo anterior no es de aplicación a los funcionarios para cuyos cargos la ley dispone un término fijo de incumbencia. Esos son removibles solamente por justa causa pues la ley, por la naturaleza de sus funciones, les fija un término en el cargo para garantizarles su independencia de criterio. *Pastor Lozada* v. *Director Ejecutivo*, supra.

También, el personal que no participa de las características antes mencionadas—ser normativos o ser de confianza—está, conforme la Ley de Personal, y conforme la mejor doctrina de administración pública, en el Servicio Por Oposición.

Debe ser de fácil comprensión que la eficiencia con que opera un organismo administrativo está limitada por dos

---

([12-A]) José Figueres, *Cartas a un Ciudadano* (1956).

factores principales: uno es la *calidad del mecanismo*, y otro es la *competencia personal* de los funcionarios y empleados a cuyo cargo está.

El propósito de la Ley de Personal es crear las condiciones que hagan posible atraer y retener a los mejores servidores públicos. Es pues, el principal propósito del régimen que establece la Ley de Personal el que el país sea servido por los más competentes y mejores servidores. Es una ley eminentemente investida del interés público.

El servicio público supone no solo pericia técnica sino también actitudes e ideales de honradez, autodisciplina, respeto a la dignidad humana y dedicación al bienestar general. Los servidores públicos que no ocupan posiciones primordialmente normativas y que por lo tanto no tienen que cesar en sus cargos cuando cambia la Administración—a tenor con lo que hemos explicado anteriormente—tienen la obligación de servir con igual eficacia a los distintos dirigentes que sucesivamente tienen a cargo la responsabilidad de gobernar, pues esa obligación de servir se basa en lealtades más amplias y básicas que las meras lealtades partidistas.

Dicha obligación de servir se basa en la lealtad al país, a la Constitución, al ideal de la primacía de la ley sobre la posible arbitrariedad humana, al respeto a la dignidad del hombre, en el sano orgullo o espíritu profesional del servidor público, y en suma, en los altos valores del espíritu.

Así también el país espera que los políticos y los administradores de más alto nivel también tengan una base irreductible de valores comunes sobre la cual—a pesar de sus diferencias de orden ideológico—puedan salvar, mantener y propiciar el interés general. En este sentido, es posible para dichos dirigentes conservar su particular ideología política y a la vez respaldar y sostener aquellos valores como el que representa la Ley de Personal, pues dicha ley representa un valor de indudable beneficio general y de por sí ni favo-

rece ni obstaculiza ninguna ideología política en particular. (¹³)

Es conveniente hacer la siguiente aclaración con el propósito de prevenir futuros errores en la administración de la Ley de Personal como el cometido en el caso de autos. El cambio de clasificación hecho en este caso y descrito antes no puede hacerse en base del apartado (c) de la Sec. 9 de la Ley de Personal, 3 L.P.R.A. sec. 649(c). Dicha disposición colocó dentro del Servicio Por Oposición a aquellas personas que *a la fecha de la vigencia* de la Ley de Personal (12 de mayo de 1947) ocupaban puestos que no estaban comprendidos dentro del servicio civil clasificado pero que en virtud de la Ley de Personal dichos puestos quedaron comprendidos dentro del Servicio Por Oposición. Se trata en ese caso de una *disposición transitoria* que se incluyó en la ley para atender la situación particular que hemos descrito. Pasada ya la fecha de la vigencia de la ley, dicha disposición cumplió su propósito y ha dejado de tener vigencia.

Debe ser claro que si se pudiese utilizar dicho apartado (c) de la citada Sec. 9, para incluir en el *Servicio Por Oposición* a personas no comprendidas dentro del servicio clasificado, o a personas comprendidas en el Servicio Sin Oposición o en el Servicio Exento, el resultado sería la destrucción completa del sistema de mérito creado por la Ley de Personal. Esto es así porque en ese supuesto—que no es correcto—se le podría dar arbitrariamente status de empleado *por oposi-*

---

(¹³) Sobre el servicio civil y el sistema de mérito, además de las obras citadas en esta opinión, pueden verse: Friedrich, *Constitutional Government and Democracy,* 4ta. ed. (1968), capítulos 2 y 19; Max Weber, *Economía y Sociedad,* trad. española de 1964 del Fondo de Cultura Económica, México, Tomo I, págs. 170–180; Friedrich y Cole, *Responsible Bureaucracy* (1932); Greer, *A Bibliography of Civil Service and Personnel Administration* (1935); Greaves, *The Civil Service in the Changing State* (1943); Robson, *The Civil Service in Britain and France* (1956); Kingsley, *Representative Bureaucracy* (1944); Friedrich, "The Continental Tradition of Training Administrators in Law and Jurisprudence," *Journal of Modern History,* Vol. 11, Núm. 2 (1939).

*ción* a cualquier empleado sin que hubiese concurrido a exámenes ni a oposición alguna y sin que cumpliese con los requisitos de la ley.

A tenor con lo anterior, *se expedirá el recurso de certiorari solicitado, se dejará sin efecto nuestra resolución de 15 de junio de 1973 en el caso de autos, se revocará la orden de mandamus dictada por el tribunal de instancia el 25 de mayo de 1973 en este caso, se revocará la orden enmendada de mandamus dictada el 31 de mayo de 1973 y se desestimará la petición de mandamus en este caso.* Los otros dos casos que fueron consolidados con éste, el O-73-207 y el O-73-208, los resolveremos mediante sentencias separadas.