**Jose Ramon ECHEVARRIA, Plaintiff,**

**v.**

**Jose G. GRACIA ANSELMI, Former Administrator, Right to Employment Administration; Rafael Cordero, Administrator, Right to Employment Administration, and Juan Manuel Rivera Gonzalez, Secretary of the Department of Labor and Human Resources, Commonwealth of Puerto Rico, Defendants.**

**Civ. No. 85–0997 (JAF).**

United States District Court,
D. Puerto Rico.

Aug. 20, 1986.

844

Israel Roldán González, Aguadilla, P.R., for plaintiff.

Paul B. Smith, Jr., Saldaña, Rey, Moran & Alvarado, Santurce, P.R., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

FUSTE, District Judge.

This is our second trial on discrimination cases related to Puerto Rico politics.[1] The case is the result of alleged civil rights and constitutional violations following the general elections held in this jurisdiction in November 1984.

Plaintiff Echevarría, a member of the New Progressive Party (PNP), the political party that lost the gubernatorial election to

---

1. The results of the first trial are reported. *See Saúl Santiago Correa v. Rafael Hernández Colón,* 637 F.Supp. 1159 (D.P.R.1986). We note that this judge alone has assigned to his calendar 93 cases of a similar nature, with 1,051 plaintiffs, of a total of about 450 related filings. No jurisdiction under the United States flag faces such alarming statistics. Therefore, we are to carefully scrutinize before deciding. Wholesale firings or demotions cannot be dealt with wholesale legal dispositions.

the Popular Democratic Party (PPD), and former Regional Director for the Ponce, Puerto Rico office of the Right to Employment Administration (REA), seeks monetary damages and injunctive relief under 42 U.S.C. Sec. 1983 (1979), against José G. Gracia Anselmi (Gracia), Rafael Cordero (Cordero), and Juan Manuel Rivera González (Rivera). Gracia served as Executive Director of REA for the period January 15 through March 31, 1985. Cordero is the incumbent Executive Director of REA. Defendant Rivera was the Secretary of the Department of Labor and Human Resources, Commonwealth of Puerto Rico, at the times material to this suit.

REA is an administrative agency under the Department of Labor and Human Resources. It was created by virtue of local law in 1968 to promote the creation, by public and private employers, of employment opportunities, and to train and/or update training of those unemployed so as to make them candidates for potential employment. The Agency has its organic act, P.R. Laws Ann. tit. 29 secs. 1101–1152 (1968), known officially as the Right to Employment Act. REA's activities are supervised by a Consulting Board presided by the Secretary of the Department of Labor and Human Resources. The Administrator of REA is appointed by the Governor of Puerto Rico. P.R. Laws Ann. tit. 29 sec. 1102 (1983).

Plaintiff Echevarría seeks relief against the defendants claiming that Gracia violated his civil rights when he was demoted from Regional Director to a career position as administrative assistant within the Agency.[2] It is a stipulated fact that Gracia separated/demoted plaintiff effective March 15, 1985 by letter delivered the same day, from his position as Regional Director to that of administrative assistant. Plaintiff's salary as Regional Director was

$1,878 a month. His salary was decreased to $1,596. The parties further stipulated that codefendants Gracia and Cordero are members of the PPD. They further stipulate plaintiff's PNP status, as well as the fact that the Regional Director who replaced plaintiff, Mrs. Daisy Silvagnoli, is a member of the PPD. Defendants admit that Mrs. Silvagnoli is also a member of the Ponce Municipal Assembly, there representing the party in power, the PPD. Fine tuning plaintiff's claim, Echevarría asserts that his demotion to the position of administrative assistant was due solely to his political affiliation, in violation of the standards set out in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

The pretrial conference was held on January 28, 1986. On said occasion, we gave the parties a firm trial setting for July 28–30, 1986, trial commencing at 9:30 A.M. No objection was noted by the parties. On July 18, 1986, defendants filed a partial motion for summary judgment, requesting a pretrial determination of their qualified-immunity affirmative defense. Pursuant to Fed.R.Civ.P. 56(c), plaintiff was entitled to oppose within ten days. The opposition was filed July 28, 1986, at 9:45 A.M., just after the case had been called for trial. We refused to entertain the motion for summary judgment. Mindful of *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) and *De Abadia v. Izquierdo Mora*, 792 F.2d 1187 (1st Cir. 1986), we balanced the interests to be protected by an early presentation in a summary judgment context of the qualified-immunity defense and the well-known rule that summary judgment motions are inappropriate on the eve of trial. It was obvious that trial was the alternative of choice.

---

**2.** We find that the position of regional director is the lowest managerial position within the Agency. REA's activities and policymaking are centralized in the consulting board presided by the Secretary of Labor. Other members are the Secretaries of Agriculture, Transportation and Public Works, Education, and five additional members appointed by the Governor. Special commissions also form part of the policymaking echelon of the Agency. P.R. Laws Ann. tit. 29 sec. 1102 (1983). An examination of the Right to Employment Act, in light of defendant Gracia's testimony, so confirms. P.R. Laws Ann. tit. 29 sec. 1123 (1968).

Having considered the evidence received at trial, we enter our findings of fact and conclusions of law. Fed.R.Civ.P. 52. We find for plaintiff. His demotion was motivated by political considerations. Defendant Gracia and his successor Cordero, as the hiring authority, could not demonstrate that party affiliation was an appropriate requirement for the effective performance of the public office involved. *Branti*, 445 U.S. at 518, 100 S.Ct. at 1294. We further find that no objective good faith was exercised in demoting plaintiff. The forces which prompted plaintiff's demotion by Gracia and the subsequent discriminatory conduct by defendant Cordero did not reach the threshold of an objectivity test. They simply acted beset or impelled by an uncontrollable, unreasonable determination that those to be employed at REA were to be not only PPD members, but firm defenders of all the postulates of the PPD party platform. The demeanor and, thus, the nonverbal impact of the testimony of defendants Gracia and Cordero was that of a political obsession, a premeditated plan to clean the house. We further hold that, on this record, defendants are not entitled to that part of the benefits of the qualified-immunity defense which was not waived by the late filing of the motion for summary judgment. *De Abadía*, 792 F.2d at 1195 (immunity from damages by virtue of their qualified immunity, whatever the outcome of plaintiff's claim for restoration of his job with back pay). Objectivity, good faith and reasonability were lacking. *Id.* at 1193.

**The Motion for Summary Judgment**

The summary judgment mechanism contemplated by Fed.R.Civ.P. 56 is used to avoid a useless trial. It is a procedural device that makes possible the prompt disposition of controversies without a trial if in essence there is no real dispute as to the salient facts. Rule 56, seen in light of a qualified-immunity defense under *Harlow* and *De Abadía*, serves two purposes. The first purpose is of pretrial procedural economy. As stated in *De Abadía*, 792 F.2d at 1189, citing from *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985),

qualified immunity is more than immunity from money damages; it is "an immunity from suit ... [which] is effectively lost if a case is erroneously permitted to go to trial. *Id.* [105 S.Ct.] at 2816.... This is so, the Court said, because, the "consequences" with which we were concerned in *Harlow* are not limited to liability for money damages; they also include "the general costs of subjecting officials to the risks of trial—distraction of officials from their official duties, inhibition of discretionary action, and deterrence of able people from government service. *Id.* at 2815 (quoting *Harlow*, ante, 457 U.S. at 816, 102 S.Ct. at 2737)."

The second purpose has been stated. It grants immunity from money damages.

■ *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), does not hold that the only procedural mechanism to bring before the court the defense of qualified immunity is Fed.R.Civ.P. 56. *Harlow* specifically holds that the issue of qualified immunity is properly raised as part of the defendant's affirmative defenses incorporated as part of that party's responsive pleading. *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736. Of course, *Harlow* and *Mitchell*, followed by *De Abadía*, encourage the parties to obtain a pretrial determination on the issue if the particular circumstances of the case allow framing the defense in the context of a motion for summary judgment. *Harlow*, 457 U.S. at 816–21, 102 S.Ct. at 2737–40; *De Abadía*, 792 F.2d at 1188–1190. This, of course, does not mean that a defendant can force the court and his opponent to entertain such motion on the eve of trial. *Management Investors v. United Mine Workers, etc.*, 610 F.2d 384, 388–89 (6th Cir.1979). Here, the late filing did not save defendants time, expense, and exposure to the court. As a matter of fact, our pretrial conference notes show that defendants do not have an expense and/or exposure problem that could be measured in monetary terms. They have been afforded free legal representation and "liability insurance" coverage under Puerto Rico law, P.R. Laws

Ann. tit. 32 sec. 3085 (Supp.1975). These defendants are entitled to a subsidized defense with full indemnification for a potential damage award. *De Abadía*, 792 F.2d at 1203 (Torruella, J., dissenting). When the case is called for trial, as in this case, the trial becomes the best test of the *rights of the* movant and the *defenses of the respondent.* We see no reason to depart from this common-sense approach. The parties are entitled to their day in court. Both parties were afforded a just and speedy determination of all issues at the district-court level. Fed.R.Civ.P. 1; *Wells v. Hico Independent School District,* 736 F.2d 243, 251 n. 10 (5th Cir.1984).

## The Facts

On February 1, 1977, plaintiff was appointed Regional Director, REA, Mayaguez, Puerto Rico. He held said position until November 16, 1979. On said date, plaintiff was appointed to the career service as REA's Regional Operations Coordinator. On November 15, 1980, permanent employee status was attained. On March 1, 1981, plaintiff was transferred and appointed to the exempt service as Regional Director, REA, Mayaguez, Puerto Rico.

Subsequently, he was transferred to the same position at the Ponce office, where he remained as such until March 15, 1985.

Defendant Gracia was appointed Executive Director of REA by the incumbent governor on January 2, 1985. Gracia resigned as director or administrator on March 31, 1985. Upon Gracia's resignation, defendant Cordero was appointed Executive Director or Administrator. His appointment became effective April 1, 1985. Cordero is the incumbent administrator, head of the Agency.[3] The evidence shows that as of said January 1985, plaintiff was not allowed to perform his functions as regional director. Mr. Eliezer García had been sent by central office to act as *de facto* regional director. On March 15, 1985, defendant Gracia separated plaintiff as regional director. He was informed that he would become an administrative assistant, that is, a career employee. However, the OP–16 form outlining his new duties was not made available to him until much later. Codefendant Cordero was the administrator when this form was made available in April 1985.[4]

As of March 15, 1985, that is, the day that the demotion took place, the nine re-

---

3. Under the Puerto Rico Public Service Act, P.R. Laws Ann. tit. 3 secs. 1301–1431, known as the Personnel Law, civil-service positions are of two categories: career employees and confidential employees. *Id.* sec. 1349. Career employees are selected and promoted solely on the basis of merit. On the other hand, confidential or trust employees are of free selection and removal. *Id.* sec. 1350. The positions of Regional Director held by plaintiff from 1977 to 1985 are designated as confidential or trust positions. The position held by plaintiff as Regional Operations Coordinator from November 1980 to March 1981 was designated as a career position. This position gave plaintiff a proprietary interest in continued employment. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). On the basis of the interest in continued employment, defendant Cordero activated a career position for plaintiff as administrative assistant. The personnel law is not the only criteria of reference in determining whether the demotion is protected. Federal law is the proper parameter of reference. *See Saúl Santiago Correa v. Rafael Hernández Colón,* 637 F.Supp. 1159 (D.P.R. 1986).

4. We received in evidence two OP–16, Description of Job Forms. Joint Exhibit II corresponds to the job classification of Regional Director. Exhibit M corresponds to the job description form given to plaintiff in April 1985 to cover the position of Administrative Assistant. Both forms were prepared by the Central Personnel Office, Commonwealth of Puerto Rico. Contrary to the facts in *De Abadía,* they *were not* signed by plaintiff. Exhibit M, presented in the original form, is not even dated or signed by plaintiff's supervisor. Contrary to *De Abadía,* 792 F.2d at 1191–92, we do not have a case where plaintiff intends to create contradiction as to his duties. What we have is a case *on the merits* where the evidence clearly showed that the position of regional director, with or without the OP–16 form, is not one where, in order to perform effectively, the person must share the other party's political belief and party commitments. *De Abadía* does not hold that the OP–16 form is the source that determines the *Branti* burden. *De Abadía* correctly permits that a *Branti* issue be the object of trial irrespective of OP–16 forms. *De Abadía,* 792 F.2d at 1192. If the OP–16, seen in isolation, is to control a legal determination, then we may as well flush *Branti* as binding legal precedent.

gional directors had been replaced or were in the process of being replaced.[5] As a matter of fact, three regional directors resigned. Six others, including plaintiff, were either demoted or fired.

As of March 15, 1985, then administrator Gracia, even though the agency was plagued with all kinds of problems, could not pinpoint any problem in the Ponce Regional Office that would merit the removal of Echevarría. Gracia did not meet with anybody within the Agency to study the particular case of plaintiff; had no complaints about plaintiff's performance; had no reason to doubt that he was a good employee; met with Echevarría once only, to demote him, and did not consider giving Echevarría an opportunity to prove that he could work with the new administration as Echevarría had requested. Defendant Gracia never met any of the nine regional directors and, as a matter of fact, never gave them any kind of order. Defendant Gracia relied not on the regional directors, but on the program directors for policy implementation. He demoted plaintiff, whom he knew as a PNP affiliate, after discussing the matter at the Department of Justice.[6] In his sincere and emotional tone, defendant Gracia volunteered, against his own cause, that the agency wanted a new staff, that is, people who would not be tainted with the tare or "hereditary" trait of being a PNP.[7] This, in the mind of Mr. Gracia, seemed to be the discharge of the defendant's burden under *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), i.e., that the functions of the office involved authorized, either directly or indirectly, meaningful input into government decision-making on issues where there is no room for principled disagree-

ment on goals or their implementation. *De Abadía*, 792 F.2d at 1192. Furthermore, this was defendant Gracia's evidence on his burden of whether party affiliation was an appropriate element or requirement for the effective performance of the public office. *Branti v. Finkel*, 445 U.S. at 518, 100 S.Ct. at 1294. In so doing, he adopted defendant Cordero's testimony as a whole. Cordero had stated to the court that winning the elections gave those in power license to fire or demote as they wished. This, of course, is not acceptable. It constitutes illegal conduct.

When pursuing a *Branti*-burden defense, coupled with a qualified-immunity defense in this type of political discrimination case, the defendant must show that an objective good faith process was followed in reaching the decision to fire or demote. There is no question that under *Branti*, the burden is on the defendant to prove that party affiliation was an appropriate element or requirement for the effective performance of the public office. There should be no question about the burden that *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), also imposes when, in addition to the *Branti* defense, objective good faith is pleaded as part of the affirmative defense of qualified immunity. *Harlow*, at 819, 102 S.Ct. at 2738, states:

> [N]evertheless, if the official pleading the defense claims extraordinary circumstances *and can prove* that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. *But again*, the defense would turn primarily on objective factors. (Emphasis added).

---

5. The OP–16 Form outlining the duties of plaintiff as regional director appears as Appendix I. The form and the evidence do not suggest that plaintiff was anything else than a district manager with a big title and routine functions.

6. The record is silent as to the opinion which the Department of Justice gave Gracia. Any litigant acting in good faith, if his decision to demote or fire under *Branti* had been the object of a legal opinion, would not hesitate to disclose

the terms of the opinion as part of the discharge of his *Branti* burden.

7. The Spanish word "tara" was used by defendant Gracia to describe the political characteristics of those he had demoted or fired. "Tara", as used in Spanish, has a very strong pejorative connotation of physical or psychic defect of a hereditary character, such as hemophilia. *See Diccionario de la Lengua Española* 1287 (Real Academia Española ed. 1984).

There is no question in our mind that both *Branti* and *Harlow,* and, of course, *De Abadía,* do not stand to protect lawless conduct. The policy choice has been made by the Supreme Court of the United States, and we are to follow it through.[8] Furthermore, *Harlow* reminds us:

> By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected *by a test that focuses on the objective legal reasonableness* of an official's acts. Where an official could be *expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate;* and a person who suffers injury caused by such conduct may have a cause of action. (Emphasis added).

*Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738.

■■■ This means, in the *Branti/Harlow* context,[9] that when the hiring authority, acting responsibly and objectively, passes judgment on the pros and cons of the action to be taken, in good faith, then the firing and/or demoting of an employee is protected conduct. This requires that the objective good faith analysis consider whether political-party affiliation is indeed a *bona fide* requirement for a given job. This further requires that the applicable law be considered to determine whether clearly-established rights are implicated.

■■■ Going back to the evidence, we do not see how Mr. Gracia's testimony, that is, the testimony of the demoting authority, discharged the *Branti* burden. As we have stated, he simply decided, after consulting with the local Department of Justice, terms of the consultation unknown, to fire or demote all regional directors. No objective analysis was made. In his view,

the PNP "tara" was to end, or, better stated, genetically-defective, PNP directors, were to be removed. If in the context of this case one were to find that Gracia, by March 15, 1985, had made a determination that political-party affiliation was a necessary requirement for the effective performance of public office by the regional directors, then we must say that *Branti* has no practical value as a legal precedent. We cannot accept that the demoting authority's subjective and clouded conclusion of having met the standard is the appropriate test. This would equate to a *de facto* reversal of *Branti.* The case law requires that this be demonstrated by preponderance. Such preponderance is lacking here. Furthermore, we are compelled to find that by March 15, 1985, Gracia had enough indicators calling his attention to the fact that his conduct could be understood as violating constitutional rights. This defendant, if objective, had to hesitate before demoting Echevarría. As a matter of fact, on February 25, 1985, this court decided that a former regional director for the REA Humacao District, was entitled to reinstatement by virtue of the same legal precedent, i.e., *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 2727, 63 L.Ed.2d 574 (1980). *See Rodríguez v. Muñoz,* 603 F.Supp. 349 (D.P.R.1985). Furthermore, this court's decision in *Rodríguez* stated that under both the Puerto Rico and the United States Constitutions, a REA regional director, a public official in the trust or confidential service ("servicio de confianza") was constitutionally-protected from political discrimination, since the government did not demonstrate that political affiliation was an appropriate requirement for the effective performance of the public office involved. The ousted regional director was reinstated by order of this court on February 25, 1985, while defendant Gracia was the incumbent REA administrator. That decision alone, until reversed or mod-

---

**8.** *See* majority and dissenting opinions in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 2727, 63 L.Ed.2d 574 (1980).

**9.** *Branti* and *Harlow* are related cases. One must see the rule of the first in light of the

practical approach of the second. It seems to us proper, within the factual context of this case, to speak in terms of a combined test of practical application of the policy choice handed down by the Supreme Court as the law regarding this type of litigation.

ified on appeal, had the force of clearly-established statutory or constitutional rights so as to make defendant Gracia hesitate.

There is more to be said on what the hiring authority knew or should have known on clearly-established legal guidelines at the time of the Echevarría demotion. The subject of wholesale firings or demotions following general elections has been the object of decisions by the Puerto Rico Supreme Court. These decisions, being a carbon copy of *Branti*, made the same adverse finding with regard to this type of regional director post as did this court in *Rodríguez v. Muñoz*, 603 F.Supp. 349 (D.P.R.1985). *Colón v. CRUV*, 115 P.R.Dec. 503 (1984); *Ramos v. Secretario de Comercio*, 112 P.R.Dec. 514 (1982). The opinion in *Colón* passed upon the requirements of political affiliation as a prerequisite for the effective performance in public office as adopted from *Branti* in the *Ramos* decision. *Colón* refused to accept as discharge of the *Branti* burden the defendants' view to the effect that they were at liberty to select those upon which they could deposit the task of executing orders or instructions at the regional level. As is the case here, the firing official in *Colón* did not base his decision on the qualifications of the employee. The Supreme Court stated in *Colón v. CRUV*, 115 P.R.Dec. at 506–10: [10]

> *Now then, the reason inferred by Executive Director Ríos Sánchez for their substitution, that is, to recruit persons*

*of his trust to execute his orders or instructions, is of little juridical and persuasive value.* The appellants inferred that it really was due to political discrimination. The evidence and circumstances present herein move us to agree. It was stipulated that "plaintiff's administrative ability was never in controversy or was it ever a detrimental factor in the decision." The allegation that they were replaced by members of a different party creates a strong inference that this was the real motive. In these circumstances, it is justified to conclude, through the preponderance of the evidence, that there was political discrimination. *Navedo v. Municipio de Barceloneta*, 113 D.P.R. 421 (1982); *Báez Cancel v. Mayor Mun. of Guaynabo*, 100 P.R.R. 980 (1972). *They were entitled to have their cause of action weighed under the doctrine stated in Ramos v. Srio. de Comercio, 112 D.P.R. 514 (1982). To such effects, although their functions were confidential in nature, we note that the appointing authority has not been able to show that the political affiliation was an appropriate requirement for the discharge of the public office in question. We are not surprised.* We do not see that the faithful and efficient discharge of the duties of a District Manager or General Supervisor, as listed in OP–16 of the Personnel Office, of a public housing program requires a given loyalty to the ideological axioms of a politi-

10. The concurring opinion by Chief Judge Campbell in *De Abadía v. Izquierdo Mora*, 792 F.2d at 1195, expressed some concern over Judge Torruella's reliance on Puerto Rico Supreme Court precedent to this effect. *De Abadía*, 792 F.2d at 1206–07 (Torruella, J., dissenting). We attempt to harmonize the majority opinion and concurring opinion as they could be applicable to this case with Judge Torruella's dissent on this subject by stating that here, we are not deciding the case on the basis of a state pendent claim. Our reliance in *Colón v. CRUV*, 115 P.R.Dec. 503 (1984), and *Ramos v. Secretario de Comercio*, 112 P.R.Dec. 514 (1982), is simply to establish that the Puerto Rico Supreme Court, faced with similar actions, has adopted the *Branti* view, and has specifically stated that the unique circumstances of the highly-charged Puerto Rico political atmosphere make it imperative for judges to be on the guard

against potential illegal demotions or firing under the disguise of "proper party affiliation" and "qualified immunity". Failing to recognize this sad reality may result in discrimination being allowed notwithstanding precedent. The deference that federal courts have extended to local assessment and precedent should be adopted here. *Colón v. CRUV* expressed a unanimous decision by the Supreme Court of Puerto Rico as recent as 1984. *See Posadas de Puerto Rico v. Tourism Co.*, —— U.S. ——, 106 S.Ct. 2968, 2976 n. 6, 92 L.Ed.2d 266 (1986); *Fornaris v. The Ridge Tool Co.*, 400 U.S. 41, 42–43, 91 S.Ct. 156, 157–158, 27 L.Ed.2d 174 (1970). In this sense only, Judge Torruella's dissent in *De Abadía*, 792 F.2d at 1195, in that part of the opinion where he discusses not the legalities, but the particular and unique situation of Puerto Rico's political-discrimination cases from an etiological point of view, merits great weight and consideration.

cal party. Such a preference is not necessarily a valid criteria for being either the person entrusted with implementing that social program's policies, or the recipient of such benefits. The only clear way to approach any application should be the need for housing and any other deserving factors of the case. Political affiliation is foreign to the process of eligibility. The following pronouncement is applicable:

> [W]e may reasonably conclude that the hiring authority (the government) must bring evidence to show that the employee's particular political affiliation is an "appropriate requirement" for the effective discharge of the public office in question; that is to say, the Government must establish the existence of government interests that rank above the employee's rights under the First Amendment.

In the case at bar, the Government failed to establish this. *Ramos, supra* at 516.

> *On the other hand, the highly charged political climate that unfortunately prevails in our country and permeates all governmental functions prevents us from discarding the possibility that, in a specific case, an employee not affiliated with the political party in power may turn his back on the requirements of his functions as a public servant. If the situation should arise, the determination as to the validity of his removal or dismissal should be made while taking into consideration, among other circumstances—and aside from the fact that he may be a confidential employee—the opportunity that he has had under the new administration to show, within a reasonable term, that his competence, efficiency, and loyalty to public service exioms have not been affected and are above his personal political preferences.*
>
> *The courts must break the trend and vicious circle established on the* island, *of substituting government personnel, after each general election, on grounds foreign to a sound public administration; the political patronage and spoils system.* Olivieri Morales, supra. The scenario recurs each time there is a change in the political party in power. *The adverse consequences are fatal and alarming:* the reduction in funds is substantial. It is a judicially recognized fact that payment of these types of judgments results in a financial crisis and have a negative impact on the budget. It constitutes a substantial detouring of public funds in detriment to the essential public services, independently from the recipient's political affiliation. *The courts must exhaust all resources to design dissuasive remedies.* (Footnotes omitted) (emphasis added).

*See* complete text, English translation, *Colón v. CRUV*, 115 P.R.Dec. 503 (1984), and *Ramos v. Secretario de Comercio*, 112 P.R.Dec. 514 (1982), Appendices II and III, respectively, to these findings. We call the attention of the reader to the fact that the translations cannot be a substitute for the Spanish originals under any circumstance. Too much is lost in the translations.

Going back to the evidence received by this court in this case, we find that after plaintiff Echevarría was demoted by codefendant Gracia, the new administrator or executive director, Rafael Cordero, promoted and allowed the continued harassment of plaintiff. As an administrative assistant, Echevarría sits at a desk he found in the office. He spends the day reading newspapers. No work is assigned to him, except on Thursdays, when the incumbent Regional Director Daisy Silvagnoli orders him to review and correct the weekly report sent to REA's central office.[11] Cordero accuses plaintiff, with obvious hatred, of being part and parcel, an active participant, of the REA economical mismanagement found by the new administration. He would have fired him in any event for that

---

**11.** Plaintiff's present functions as administrative assistant, as per his OP–16 Form, are:

1. Analyze problems or situations of an administrative nature *as assigned by his supervisor.*

reason only. However, as we stated before, the demoting authority, Mr. Gracia, admitted that there was no such evidence in his hands at the time of demotion.[12]

■ On this record, we can only conclude that plaintiff's demotion was politically motivated, followed by hatred, humiliation, and harassment, there being no preponderant evidence on the subject of political affiliation as an appropriate requisite for the discharge of the functions of regional director, REA. Objectivity was lacking. Disregard to legal precedent was patent. Our original assessment that defendants acted beset or impelled by an uncontrollable, unreasonable preoccupation of political nature, in the nature of an obsession, is the only way in which we can describe the nonverbal impact of the defendant witnesses' testimony.

### Judgment

Based on the findings and conclusions entered today, the defendant Rafael Cordero is hereby **ORDERED** to reinstate plaintiff to his former position as Regional Director of REA, Ponce, Puerto Rico, with the salary and benefits of the office, with back pay retroactive to the date of discharge. Plaintiff is further awarded the amount of **$12,000** to compensate damages. This record suggests that the plaintiff was exposed to humiliation and continued harassment as a result of defendants' conduct as outlined herein. Defendants are made aware of the fact that since 1950, the Legislature of Puerto Rico condemned discrimination based on political affiliation. Such conduct carries not only civil penalties, but also potential criminal prosecution. *See* P.R. Laws Ann. tit. 29 sec. 136 (1950), and *Id.* sec. 146 (1983).

2. Give follow up to the tasks *assigned by his supervisor.*
3. Recommend changes in administrative proceedings and rules of internal procedure.
4. Receive, orient, and interview the public in general.
5. Take care, assist, and give follow up to matters *assigned by his immediate supervisor.*
6. Write and review correspondence *as per delegation.*
7. Prepare and write reports of various kinds.

The complaint is hereby **DISMISSED** as to codefendant Juan Manuel Rivera González for lack of evidence against him.

IT IS SO ORDERED.

### APPENDIX I

As a regional director, plaintiff had the following duties:

1. The regional director represents the administrator at the regional level.

2. The regional director directs and supervises the implementation of the various programs *established and/or managed by the Right to Employment Administration.*

3. The regional director will establish norms and internal administrative procedures to regulate the functioning of the regional office, *within the scope of the applicable law, rules and regulations that bind the functions of the agency.*

4. The regional director will apply at the regional level, rules, regulations, and proceedings to "regulate" the functioning of the agency.

5. The regional director will coordinate and direct the activities and services of the various programs of the agency at the regional level.

6. The regional director will prepare and submit to the Right to Employment Administration weekly, monthly, and yearly reports covering work done or being done, with recommendations, norms and procedures that could be implemented in the REA programs at the regional level.

7. The regional director will review and answer all correspondence directed to his office, unless he decides to delegate said function when he deems it pertinent.

8. Attend official meetings *when so required of him.*
9. Perform other tasks *as required.*
The fact that plaintiff sits without work assignments is an uncontroverted fact.

12. When this evidence was presented, we informed the parties that if they could prove Echevarría's involvement in mismanagement, the case would end right then and there. This court will not serve as refuge for corrupt or careless public officials under the disguise of 42 U.S.C. Sec. 1983 (1979).

8. He will review and approve requisitions for materials, supplies, and equipment needed for the proper functioning of the office and the different programs.

9. He shall submit the necessary data to justify the reassignment or creation of positions to confront or absorb the growth in duties and obligations of the office.

10. He shall be in charge of the selection of regional personnel.

11. He will recommend the granting of licenses, promotions, increases within grade, and other personnel action.

12. He shall represent REA in all internal, interagency, and community activities.

**Daily Responsibilities**

1. He shall verify and supervise the programs, directly or indirectly.

2. He shall review and will answer correspondence and will make sure that mail is referred to the programs if certain action is needed.

3. He will answer consultations by telephone.

4. He will take care of persons who wish to bring to the agency's attention any particular situation, taking into consideration the nature of the same.

5. He will advise public officials and employees in the discharge of their duties.

6. He will perform other related tasks as assigned.

## APPENDIX II

(Translation)

Juan Hermán Colón *et al.*, Plaintiffs and appellants

v.

Urban Renewal and Housing Corporation, Defendant and appellee

No. R–84–29 Review

IN THE SUPREME COURT OF PUERTO RICO

MR. JUSTICE NEGRON GARCIA delivered the opinion of the Court.

San Juan, Puerto Rico, June 4, 1984

Our Constitution "recognizes the right to have different ... and conflicting political ideas, without this difference or conflict being a negative or positive factor in any person's relations with the State." *Diario de Sesiones de la Convención Constituyente* 2562, Equity ed. (1961). In order to approach that constitutional ideal, it is time that administrators, appointing authorities, and mayors understand that the Judicial Power shall not tolerate politico-partisan discrimination or unlawful dismissals.

I

This appeal stems from a complaint filed by Juan Hermán Colón, César Rivera Flores, and Luis R. Castañeda, for their allegedly unlawful dismissal from their positions in the Urban Renewal and Housing Corporation (URHC) in 1973.

A brief background of the public career of these officers is in order. According to the findings of the learned trial court, in 1954 Colón began to work with the Ponce Housing Authority which was absorbed into the URHC. In 1969, he worked as Accountant III, with a monthly salary of $525.00. That year, he was appointed Ponce District Manager, with the position of Housing Administration Executive. Castañeda began working in URHC on September 1, 1963, and in 1969 was Accountant III in Humacao. He earned $550.00 monthly. On August 1, 1969, he was appointed Executive Officer VI, General District Supervisor. Rivera Flores was an Agronomer IV in the Noncompetitive Service, within the Department of Agriculture. He then earned $650.00 monthly. On September 16, 1971, he was appointed as Manager or General District Supervisor for the Caguas Office of URHC. These three persons were publicly identified with and were active members of the New Progressive Party (N.P.P.). Under that governmental administration they were directly appointed by the then Executive Director of URHC, Mr. Miguel Santiago Meléndez.

The Personnel Regulations of the URHC in force at the time these appointments were made, classified the position of Gener-

al District Supervisor as confidential. An amendment introduced by the Board of Directors on October 24, 1972 to classify such positions as "regular or career" was subsequently declared null.

The composition of the Central Administration changed in 1973. The new Secretary of Housing named Ismael Ríos Sánchez, and Mrs. María L. Guerra as Associate Director of the Housing Administration Program. During January and February, Ríos Sánchez met with each of the plaintiffs. He told them that he was going to appoint "persons of trust" to the position of General District Supervisor. He offered Colón and Castañeda regular positions in the agency equal to the positions they previously held. Both rejected the offer because of the salary reduction the same would represent. Rivera Flores, who previously held no position in URHC—he came from the Department of Agriculture—stated his plans of returning to the private sector. Under the premise that such positions were confidential, they were dismissed. Allegedly, they were eventually substituted by persons identified with the Popular Democratic Party (P.D.P.).

They appealed to the San Juan Superior Court, questioning the legality of that decision. The trial court concluded that the services rendered by plaintiffs were those rendered by confidential employees, hence, the summary dismissal was valid. We issued an order to show cause in order to examine said judgment.

## II

It is clear that at the time when appellants were named District Managers, the URHC Personnel Regulations contained a procedure for the recruitment of *career* personnel. It required persons to take and pass entrance and promotion tests for the different positions; it also established a list of eligibles. None of the plaintiffs appellants went through that process. Their appointments were direct. That procedure, together with the nature of their functions, tends to sustain the conclusion that they were confidential employees. In view of that situation we would not ordinarily intervene with the decision of the trial court dismissing the complaint.

Now then, the reason inferred by Executive Director Ríos Sánchez for their substitution, that is, to recruit persons of his trust to execute his orders or instructions, is of little juridical and persuasive value. The appellants inferred that it really was due to political discrimination. The evidence and circumstances present herein move us to agree. It was stipulated that "plaintiff's administrative ability was never in controversy or was it ever a detrimental factor in the decision." [1] The allegation that they were replaced by members of a different party creates a strong inference that this was the real motive. In these circumstances, it is justified to conclude, through the preponderance of the evidence, that there was political discrimination. *Navedo v. Municipio de Barceloneta,* 113 D.P.R. 421 (1982); *Báez Cancel v. Mayor Mun. of Guaynabo,* 100 P.R.R. 980 (1972). They were entitled to have their cause of action weighed under the doctrine stated in *Ramos v. Srio. de Comercio,* 112 D.P.R. 514 (1982). To such effects, although their functions were confidential in nature, we note that the appointing authority has not been able to show that the political affiliation was an appropriate requirement for the discharge of the public office in question. We are not surprised. We do not see that the faithful and efficient discharge of the duties of a District Manager or General Supervisor, as listed in OP–16 of the Personnel Office,[2] of a public housing program

---

**1.** The lack of the administrative ability necessary for a position; or carelessness, inefficiency or lack of discipline in the discharge of such functions, would be grounds to validly dismiss a confidential employee.

**2.** It read:

"1. Plan, organize, assign, and supervise all operational and administrative activities in the district, such as: social services and Community Work offered to residents, selection and occupation of housing, accounting, and maintenance of district projects.

requires a given loyalty to the ideological axioms of a political party. Such a preference is not necessarily a valid criteria for being either the person entrusted with implementing that social program's policies, or the recepient of such benefits. The only clear way to approach any application should be the need for housing and any other deserving factors of the case. Political affiliation is foreign to the process of eligibility. The following pronouncement is applicable:

> [W]e may reasonably conclude that the hiring authority (the government) must bring evidence to show that the employee's particular political affiliation is an "appropriate requirement" for the effective discharge of the public office in question; that is to say, the Government must establish the existence of government interests that rank above the employee's rights under the First Amendment.

In the case at bar, the Government failed to establish this. *Ramos, supra* at 516.

"2. Revise and sign all reports rendered to the Central offices of the Housing Program related to different stages of work in the district.

"3. See to it that all the norms and regulations are complied with and implemented in accordance with the policies of the Housing Program.

"4. Inform and advise district personnel on any changes in the norms and regulations.

"5. Revise and approve all reports concerning changes in rent, reports rendered to the federal agency, other government agencies and the central offices; accounting reports, purchase orders, disbursements, requisitions, preliminary budget of regular and special maintenance work, and the operational budget of the district and any other report concerning the different operational stages in the district.

"6. Appear in representation of URHC in meetings with other governmental officers or civic leaders in the community, with the purpose of discussing and coordinating the implementation of social, economic, and health services, etc., offered to residents of public housing.

"7. Draft reports, in English or Spanish, to be submitted to the Program's Central Offices, the Executive Director, other governmental agencies, the governor's office, etc.

On the other hand, the highly charged political climate that unfortunately prevails in our country and permeates all governmental functions prevents us from discarding the possibility that, in a specific case, an employee not affiliated with the political party in power may turn his back on the requirements of his functions as a public servant. If the situation should arise, the determination as to the validity of his removal or dismissal should be made while taking into consideration, among other circumstances—and aside from the fact that he may be a confidential employee—the opportunity that he has had under the new administration to show, within a reasonable term, that his competence, efficiency, and loyalty to public service axioms have not been affected and are above his personal political preferences.

### III

The courts must break the trend and vicious circle established on the island, of substituting government personnel, after each general election, on grounds foreign to a sound public administration; the politi-

"8. Draft correspondence, in English or Spanish, for his own signature, and for the signature of the Program's Associate Director or the signature of the Executive Director.

"9. Make recommendations on personnel recruitment, dismissals, salary raises and other matters related to the District employees.

"10. Receive and attend to residents or the general public, in cases that pose difficult problems that could not be settled at a lower level.

"11. Carry out periodical meetings with his supervisory personnel to advise them on changes in norms and regulations, notify new work guidelines, evaluate the work carried out, and establish work priorities and other related priorities.

"12. Make frequent visits to district housing projects to make sure that their operations are adequate.

"13. Hold periodic meetings with the Housing Program's Associate Director to discuss complex problems related with District operations.

"14. Attend all telephone calls to receive or give information concerning District operations.

"15. Carry out any other special task assigned."

cal patronage and spoils system. *Olivieri Morales, supra.* The scenario recurs each time there is a change in the political party in power. The adverse consequences are fatal and alarming: the reduction in funds is substantial. It is a judicially recognized fact that payment of these types of judgments results in a financial crisis and have a negative impact on the budget. It constitutes a substantial detouring of public funds in detriment to the essential public services, independently from the recipient's political affiliation. The courts must exhaust all resources to design dissuasive remedies.[3]

On the grounds cited above, judgment shall be rendered reversing the judgment of the San Juan Superior Court of October 19, 1983, and declaring the removals null. When said court provides the compensation for back pay it shall make the corresponding deductions for salaries, taxes, social security, retirement, and others. See *Estrella v. Mun. de Luquillo*, 113 D.P.R. 617 (1982); *Municipio de Mayaguez v. Rivera*, 113 D.P.R. 467 (1982). It shall also deduct whatever other amounts are proper in the particular circumstances of this case.

The case is remanded to the trial court for further proceedings consistent with this opinion.

### APPENDIX III

Ramos *v.* Sec. of Commerce

ARTURO RAMOS VILLANUEVA, Plaintiff and Appellee, v. JUAN CINTRON, SECRETARY OF COMMERCE, ETC., Defendants and Appellants.

No. R–81–137.

Decided March 31, 1982.

1. PUERTO RICO—COMMONWEALTH—STATUS AND POLITICAL RELATIONS—EFFECTIVENESS OF UNITED STATES CONSTITUTION AND LAWS IN PUERTO RICO.

The fundamental rights protected by the Constitution of the United States and the case law rules that define their contents and scope, extend to Puerto Rico.

2. PUBLIC OFFICERS AND EMPLOYEES—IN GENERAL—APPOINTMENT, QUALIFICATION, AND TENURE—RESIGNATION, SUSPENSION, OR REMOVAL—GROUNDS FOR REMOVAL—POLITICAL IDEAS OF OFFICER.

The First Amendment to the Constitution of the United States protects a public employee from dismissal both for what he has said, and for what he believes; therefore, unless there is a requirement that the private beliefs of the person conform to those of the appointing authority, the person's beliefs cannot be the sole reason for depriving him of continued employment.

3. ID.—ID.—ID.—ID.—ID.—ID.

Pursuant to the First Amendment to the Constitution of the United States, partisan affiliation could be an acceptable requirement for some types of government employment.

4. ID.—ID.—ID.—ID.—ID.—ID.

If a government employee's private political beliefs interfere with the discharge of his public duties, his First Amendment rights must yield to the State's vital interest in maintaining governmental effectiveness and efficiency.

5. ID.—ID.—ID.—ID.—ID.—ID.

Removal of a person from public employment because of his or her political beliefs requires a showing by the hiring authority—the Government—that the employee's particular political affiliation is an appropriate requirement for the effective discharge of the office in question. In other words, the Government must establish the exist-

---

**3.** The situation is critical and calls for an urgent remedial judicial creativity. In this case the trial court dismissed the complaint. The complaint was brought solely against URHC and the officers, in their official capacity, not personally. For such reason, said forum did not draw any findings as to whether or not they acted in bad faith and with total disregard for the constitutional and civil rights, nor did it provide other remedies, question on which we need not pronounce ourselves at this time.

ence of government interests that rank above the employees rights under the First Amendment to the Constitution of the United States.

6. ID.—ID.—ID.—ID.—ID.—ID.

All public employees, even those who are confidential, enjoy a protection against discrimination for political beliefs.

7. ID.—ID.—ID.—ID.—ID.—ID.

A person's constitutional right not to be discriminated against because of his or her political beliefs is not unlimited, and, in certain circumstances, it may yield before high-ranking community interests.

8. ID.—ID.—ID.—ID.—ID.—ID.

The Constitution recognizes and permits that, in certain circumstances, a particular politico-partisan affiliation be validly required in order to obtain and keep public office, although such cases are not the rule, but the exception.

JUDGMENT of *Aladino Torres Rivera*, Judge (Aguadilla), finding for plaintiff in a complaint for the discharge of a public employee for political reasons and ordering his reinstatement. *Affirmed.*

*Hector A. Colon Cruz, Solicitor General,* and *Lirio Bernal, Assistant Solicitor General,* for defendants and appellants. *Noel Vera Mercado* for plaintiff and appellee.

(Translation)

Arturo Ramos Villanueva, Plaintiff
and appellee

v.

Juan Cintrón, Secretary of Commerce, etc., Defendants and appellants

No. R–81–137 Review

IN THE SUPREME COURT OF
PUERTO RICO

MR. JUSTICE NEGRON GARCIA delivered the opinion of the Court.

San Juan, Puerto Rico, March 31, 1982

We affirm here the Superior Court's opinion which annulled, in the factual cir-

cumstances of the case at bar, an employee's dismissal for political reasons. Defendants-appellants' thesis that said dismissal is valid because appellee Ramos Villanueva's position—Director of the Aguadilla Region—was confidential and because he participated in the agency's policy-making, violates the basic guarantees of our Constitution, the First Amendment to the Federal Constitution, and the most recent federal case law. We shall explain ourselves.

I

The learned trial court found that Ramos Villanueva's dismissal was mainly due to his political affiliation. It then applied the rule laid down by the Federal Supreme Court in *Branti v. Finkel,* 445 U.S. 507 (1980), and concluded that the dismissal was null. Its decision was correct.

In *Branti,* which decision was based on the fundamental right to freedom of association,[1] the Federal Court deemed that "[i]f the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes. Under this line of analysis, unless the government can demonstrate 'an overriding interest,' ... 'of vital importance,' ... requiring that a person's private beliefs conform to those of the hiring authority, his beliefs cannot be the sole basis for depriving him of continued public employment." At 515. Citing *Elrod v. Burns,* 427 U.S. 347 (1976), the Court acknowledged that partisan affiliation could be "an acceptable requirement for some types of government employment," and thus it concluded that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency...." Based on the foregoing, the Court concluded:

1. The fundamental rights protected by the Federal Constitution and the case law rules that define their contents and scope, extend to Puer-

to Rico. *Pueblo v. Duarte Mendoza,* 109 D.P.R. 596 (1980).

In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved. (Underscore supplied.) At 518.

From the foregoing statements we may reasonably conclude that the hiring authority (the government) must bring evidence to show that the employee's particular political affiliation is an "appropriate requirement" for the effective discharge of the public office in question; that is to say, the Government must establish the existence of government interests that rank above the employee's rights under the First Amendment.

In the case at bar, the Government failed to establish this. The record shows that the hiring authority did not bring any evidence to demonstrate that the political affiliation of the employee appointed to the position held by Ramos Villanueva was an appropriate requirement for the effective discharge of such office. On the contrary, the agency's Personnel Director said that she "did not know that the incumbent's political affiliation had any impact whatsoever or was in any way essential for the development of the agency's programs." Her testimony was corroborated by the evidence brought by the Government in the sense that analogous offices—those of the Guayama and Fajardo regional directors—"are classified within the *career service* and this situation has not caused any problems whatsoever in the development of the Department's programs...."

In order to overcome the negative impact of this reality, the appellants give inordi-

nate value to a letter of June 23, 1973 [2] whereby Damián Folch, the then Secretary of Commerce, informed Milagros Guzmán, the Director of Personnel, that he was going to classify Ramos Villanueva's position in the "Non-Competitive Service." A careful analysis of its contents shows, at the most, that the author's view on this point was: (a) that the person who would hold the office should be within the Secretary's confidence; and (b) that he "[should] have to make decisions on his own initiative" in order to implement the law, that is to say, he would somehow be a policymaker. Unless we infer that the expression that this officer "... represents me as Secretary of Commerce, while he also represents our Government," embodies, includes and expounds a claim for strict partisan affiliation, there is no evidence to support the Government's thesis. This notwithstanding, as we have said above, we would have to reject, with no apparent reason, the direct and uncontroverted testimony of the Director of Personnel in the sense that the incumbent's political affiliation did not have "any impact whatsoever or was in any way essential for the development of the agency's programs." In other words, the record does not favor the following questions: Is a particular political affiliation necessary for the faithful discharge of the office? Are there overriding government interests to justify the encroachment upon the incumbent's constitutional rights? We repeat that the evidence brought by the Government only allows us to answer these questions in the negative.

## II

Once these points of the evidence have been clarified, it is easy to see that

2. Insofar as pertinent, it reads:

"As of that same date, I will include in the Non-Competitive Service position No. 236 of the Executive Director I assigned to the Aguadilla Regional Office. This position, whose functional title is Regional Director, was created on July 1, 1972 and since then, it has remained in the Competitive Service.

"This action is based on the fact that the incumbent to be appointed in said position

must be within my confidence as Secretary of Commerce. Due partly to its geographic position, the Aguadilla Regional Office must have certain independence, since the Regional Director will have to make decisions on his own initiative in order to implement and to give follow-up to the mandate we have been given by law. In his capacity, he represents me as Secretary of Commerce, while he also *represents our Government*."

the hiring authority's action constitutes an undue intrusion on Ramos Villanueva's right not to be discriminated against because of political beliefs, right which is enshrined in our Constitution. Art. II, Secs. 1, 4, 6, 7.[3] There is no doubt as to the substantial nature of this right—fundamental in a democratic form of government, and a corollary of dignity, respect, and equality before the law. Although it is not unlimited, it may, in certain circumstances, yield before high-ranking communitary interests—*Hermina González v. Secretario del Trabajo*, 107 D.P.R. 667, 675 (1978); *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 446 (1975); *Mari Bras v. Casañas*, 96 P.R.R. 15, 20 (1968)—and in the circumstances of the instant case—and subject to a strict judicial scrutiny, *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975); *León Rosario v. Torres*, 109 D.P.R. 804 (1980)—this right should prevail.

### III

Finally, this decision does not pass on the validity per se of a confidential classification,[4] nor does it question the power of the hiring authority to, in such instances, do without the services of an incumbent without previous notice, preferment of charges, and hearing. *Díaz González v. Tribunal Superior*, 102 D.P.R. 195, 197 (1974). Neither does it prejudge the possibility that in other cases of dismissals, attributable to political reasons, it may be lawfully detected and established—to the satisfaction of the Judicial Power—that the "political affil-

iation" requirement is expressly set forth or impliedly submerged and embodied in the previous classification, adopted through legislative, executive or administrative power upon creating an office under the *confidential* category.

Our decision simply means that the prevailing constitutional scheme recognizes and permits that, in certain circumstances, a particular politico-partisan affiliation be validly required in order to obtain and keep a public office. However, in view of the excellency presupposed and sought by a personnel system based on merit, the minimum continuity and stability of the Government's operation—irrespectively of who has temporarily the People's mandate—and the democratic maturity and tolerance to which our Constitution aspires, it is reasonable to conclude that such cases constitute not the rule but the exception. Certainly, the case at bar cannot be placed within the singularity rule contemplated.

In view of the foregoing, in strict law and constitutional analysis, *judgment shall be rendered affirming the decision of the Superior Court which annulled the dismissal.*

Mr. Justice Díaz Cruz issued a dissenting opinion. Mr. Justice Irizarry Yunqué took no part in this decision.

---

**3.** All employees, even those who are confidential, enjoy a protection against discrimination for political beliefs. In *Báez Cancel v. Mayor Mun. of Guaynabo*, 100 P.R.R. 980, 985–986 (1972), we said:

"Section 1 of Art. II of the Constitution of the Commonwealth of Puerto Rico prescribes in a clear manner that 'no discrimination shall be made on account of race, color ... political or religious ideas.' The proscription of discrimination is clear and final. *Its text does not permit any distinction.* It means to say what it says. That the State in any of its multiple functions or services shall not discriminate against a *citizen* because of the

mere fact that the latter is colored, an atheist, or on account of his political ideas. Any other construction would enervate its efficacy. To strengthen it and not to weaken it is our duty, as the principal custodians of the Constitution."

**4.** Please remember that the uncontroverted evidence established that the Guayama and Fajardo regional directors were classified as *career* employees whereas Ramos Villanueva's office was *confidential.* The least we can say is that this is an incongruity in the uniform and scientific implementation of the merit system.